578 So.2d 1155 (1991)
Mona BARNES, Individually and as the Curator of the Interdict, Daniel J. White
v.
Charles W. THAMES, Fireman's Fund Insurance Company, and Reliance Insurance Company.
Consolidated With
Mona BARNES, Individually and as the Curator of the Interdict, Daniel J. White
v.
Charles W. THAMES, Fireman's Fund Insurance Company, and Reliance Insurance Company.
Nos. 89 CA 0435, 89 CA 1057.
Court of Appeal of Louisiana, First Circuit.
February 15, 1991.
Writs Denied April 26, 1991.
*1158 Robert H. Schmolke, Edmund J. Schmidt, III, Baton Rouge, La., for plaintiff Mona Barnes Appellant-Second.
Gary M. Hellman, New Orleans, La., for defendant Charles W. Thames Appellee and Defendant-Aetna Cas. & Sur. Co. appellant First.
Wood Brown, III, New Orleans, La., for defendant-Reliance Ins. Co/United Pacific Ins. Co., appellee.
Stacey Moak, Baton Rouge, La., for defendant-La. State Dept. of Public Safety appellee.
Pamela Jean Legendre, Slidell, La., for defendant-La. Dept. of Public Safety and Corrections, Office of State Police-Appellee.
Before COVINGTON, C.J., and LOTTINGER, EDWARDS, WATKINS, CARTER, SAVOIE, LANIER, CRAIN, ALFORD[*], LEBLANC, FOIL, and DOHERTY[**] (EN BANC).
CARTER, Judge.
These consolidated appeals arise out of a suit for personal injuries resulting from a pedestrian-motor vehicle accident.

FACTS
On June 17, 1983, plaintiff, Daniel White (Daniel) was employed in a managerial position by Shop In Denmark, Inc. (SID), a retail furniture business, at its store on St. Charles Avenue in New Orleans. SID had only two shareholders, namely, Daniel's mother Mona Barnes, who also served as the corporation's president, and his uncle, James White. As a benefit of his employment, Daniel was assigned a company automobile, *1159 which he was authorized to use for business and personal purposes.
During the late afternoon of June 17, 1983, Daniel drove the automobile to Slidell, Louisiana to meet with Thomas Wolfe, a contractor with Acadian Style Homes (ASH), regarding renovations ASH was performing on certain premises located in Metairie, Louisiana. Warren Jack, a subcontractor on the Metairie project, was also present at the ASH office that afternoon.
After Daniel's meeting with Wolfe, Jack invited Daniel to a lounge located across U.S. Highway 11 from the ASH office to discuss the renovation project further. Daniel agreed, leaving his car parked at the ASH office, and walked across Highway 11 to the Quarter Note Lounge. Jack testified that he and Daniel remained at the lounge for several hours discussing problems they were having with completion of the work on the Metairie premises.
Thereafter, Daniel left the lounge to return to his vehicle. As he attempted to walk across Highway 11, he was struck by an automobile driven by Charles W. Thames. As a result of this accident, Daniel suffered numerous and severe personal injuries, including brain damage.[1]
On January 24, 1984, Barnes filed suit on behalf of Daniel for the injuries he sustained as a result of the automobile-pedestrian accident. Named as defendants were: Charles W. Thames and his liability insurer, Fireman's Fund Insurance Company; Reliance/United Pacific Insurance Company (Reliance), uninsured/underinsured motorist insurer of SID; Aetna Casualty & Surety Company (Aetna), SID's alleged excess insurer; the State of Louisiana through the Department of Public Safety and Corrections; and, the State of Louisiana through the Department of Transportation and Development (the two departments are collectively referred to as the "State").[2]
Prior to trial of this matter, plaintiff settled with and released Thames and his insurer, Fireman's Fund, for the policy limits of $50,000.00. The matter proceeded to trial against the remaining defendants, the judge determining the liability of the State and the jury determining the liability of the other defendants.[3]
At the conclusion of plaintiff's case, the trial court granted motions for directed verdict by Reliance and the State dismissing plaintiff's suit against them. The matter proceeded to trial against Aetna, the only remaining defendant. After trial, the jury returned a special verdict finding that Thames was 51% and Daniel was 49% at fault, that Daniel was acting in the course and scope of his duties as an employee of SID at the time of the accident, and that Aetna was arbitrary and capricious or acted without probable cause in failing to pay plaintiff's claim. Since Aetna stipulated to quantum of $3,500,000.00 and the jury had found Daniel 49% at fault in causing his own injuries, the trial court determined that plaintiff was entitled to damages of $1,785,000.00, subject to a credit of $50,000.00 for the settlement received from Thames and his insurer. Accordingly, judgment was rendered in favor of plaintiff and against Aetna for the $1,000,000.00 limit of Aetna's policy, together with legal interest from January 27, 1984, until paid and all costs. The judgment also cast Aetna for penalties of 12% pursuant to LSA-R.S. 22:658, attorney's fees to be fixed at a later date, and 12% interest on the penalties and attorney's fees from date of judicial demand until paid. Additionally, Aetna was cast for 12% interest on $735,000.00 (the amount by which the judgment exceeded the policy limits) from the date of judgment until paid.
Thereafter, Aetna filed a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial on several grounds. The trial court granted Aetna's *1160 motion on the issue of statutory penalties and attorney's fees finding that Aetna's refusal to pay plaintiff's claim was not arbitrary and capricious. In all other respects, Aetna's motion was denied.
From these adverse judgments, Aetna and plaintiff appeal. Aetna assigns the following errors:
1. The trial court erred in failing to grant defendant's motion for a mistrial as a result of the plaintiff's introduction to the jury of the settlement between the plaintiff and Charles W. Thames.
2. The court erred in allowing the plaintiff to submit evidence which expanded the pleadings.
3. The court erred in denying appellant's motion to strike witness and/or restrict testimony at trial.
4. The verdict rendered by the jury was in error in assigning fifty-one (51%) percent comparative negligence to Charles W. Thames.
5. The jury erred in determining that Daniel White was in the course and scope of his employment with Shop in Denmark, Inc. at the time of the accident. The trial court erred in denying appellant's motion for directed verdict on the same issue.
6. The court erred in denying the admissibility of extrinsic evidence to impeach the credibility of a witness.
7. The court erred in casting the appellant to pay twelve (12%) percent interest on the amount of the judgment which exceeds its policy limits.
8. The trial court erred in failing to allow defense counsel to question the witness, David Vasterling, immediately after his cross-examination.
9. In the event that this honorable court grants plaintiff's appeal, thereby overturning the trial court's directed verdict in favor of Reliance/United Pacific Insurance Company, the excess umbrella policy issued by Aetna Casualty & Surety Company to Shop in Denmark, Inc. cannot be "stacked" upon the underlying Reliance/United Pacific policy.
Plaintiff assigns the following specifications of error:
1. In support of plaintiff's contention that the Louisiana Department of Transportation and Development was negligent in its maintenance of U.S. 11 and that this negligence contributed to Daniel White's accident, plaintiff established that U.S. 11, as one of the state's oldest intrastate highways, had not been upgraded to facilitate the increased volume of traffic and that this failure produced a hazardous condition; therefore the Trial Court's dismissal of the Louisiana Department of Transportation and Development after plaintiff's case on the merits constituted reversible error.
2. Daniel J. White, as an employee of Shop In Denmark, Inc. and in the course and scope of his job at the time of his accident, stands in the shoes of his employer for purposes of uninsured motorist coverage under the policy issued by Reliance/United Pacific Insurance Company to Shop in Denmark, Inc.; and the Trial Court's dismissal of Reliance/United Pacific on the issue of coverage following the close of the plaintiff's case constituted reversible error.
3. Within three months after being brought into the present case, Aetna Casualty and Surety Company acknowledged that Daniel J. White was an insured under the policy issued to Shop in Denmark, Inc., that Charles Thames was at fault in causing the accident, and that Mr. Thames' fault caused Dan White damages in excess of one million dollars; therefore the Trial Court's judgment notwithstanding the jury's verdict which dismissed plaintiff's award of statutory penalties against Aetna Casualty and Surety Company constituted reversible error.
Plaintiff also filed an answer to Aetna's appeal contending that the trial court erred in directing verdicts in favor of Reliance and the State, in finding Daniel 49% at fault in causing the accident, and in granting Aetna's judgment notwithstanding the verdict.
By judgment dated August 18, 1989, this court consolidated the two appeals.

*1161 MOTION FOR MISTRIAL
Aetna contends that the trial court erred in refusing to grant its motion for mistrial. Aetna reasons that an alleged improper statement regarding plaintiff's pre-trial settlement with Thames made during plaintiff's opening statement tainted the jury's verdict.
The Louisiana Code of Civil Procedure does not expressly provide for mistrials, and the jurisprudence concerning motions for mistrial in civil cases is limited. Generally, mistrials are properly granted because of some fundamental failure in the proceeding. Searle v. Travelers Insurance Company, 557 So.2d 321, 323 (La. App. 4th Cir.1990). Generally, a motion for mistrial in a civil case should be granted under the following circumstances: (1) when, before the trial ends and the judgment is rendered, the trial judge determines that it is impossible to reach a proper judgment because of some error or irregularity; and (2) where no other remedy would provide relief to the moving party. Searle v. Travelers Insurance Company, 557 So.2d at 323. See Spencer v. Children's Hospital, 432 So.2d 823, 825-26 (La. 1983).
Motions for mistrial should also be granted upon proof of prejudicial misconduct occurring during a jury trial, which cannot be cured by admonition or instruction. Searle v. Travelers Insurance Company, 557 So.2d at 323. Because a mistrial results in the discharge of one jury and the impaneling of another to try the case anew, it is a drastic remedy. Burks v. McKean, 559 So.2d 921, 926 (La.App. 2nd Cir.), writ denied, 566 So.2d 398 (La.1990). The trial judge is vested with broad discretion to grant a motion for mistrial where no other remedy would afford relief or where circumstances indicate that justice may not be done if the trial continues. Burks v. McKean, 559 So.2d at 926; Streeter v. Sears, Roebuck and Company, Inc., 533 So.2d 54, 62 (La.App. 3rd Cir.1988), writ denied, 536 So.2d 1255 (La.1989). This court should not disturb the trial court's determination unless there was an abuse of discretion. See Streeter v. Sears, Roebuck and Company, Inc., 533 So.2d at 62.
In the instant case, during plaintiff's opening statement to the jury, counsel for plaintiff made the following remarks:
As a jury, your duty is going to be to determine if Aetna and Reliance Insurance Company have any fault in this matter. You ask yourself as insurance companies, how do they have any fault? They stand in the shoes of Mr. Charles Thames. Mr. Thames was a defendant in this case. He was sued by Dan White. That has since been settled. His insurance company
Counsel for Aetna immediately objected. Outside the presence of the jury, counsel for each side presented their argument. Whereupon the trial judge determined that, since the parties stipulated quantum of $3.5 million, which was clearly in excess of the primary insurance, an admonishment would be sufficient in the instant case. When the jury returned, the trial judge instructed the jury to disregard any reference to other insurance and any possible settlements.
We are of the opinion that the trial court did not abuse its discretion in refusing to grant defendant's motion for mistrial after the judge's admonition to the jury. The admonition requested by defendant was given by the court and was a sufficient remedy to overcome any prejudicial effect on the jury.

EVIDENTIARY MATTERS
Aetna contends that the trial court erred in ruling on numerous evidentiary matters. Specifically, Aetna contends that the trial court erred in permitting plaintiff to elicit factual testimony that did not stringently conform to the allegations pleaded in his petition.[4] In connection therewith, Aetna *1162 contends that the trial court erred in refusing to strike or restrict the trial testimony of plaintiff's accident reconstruction expert, John Ringol, in that Ringol allegedly espoused a different theory of the accident at trial than he had during his deposition. Aetna also contends that the trial court erred in refusing to admit extrinsic evidence of Daniel's prior DWI conviction to impeach the credibility of his brother, Tom. Finally, Aetna contends that the trial court erred in refusing to permit Aetna to question its witness, David Vasterling, immediately after plaintiff's cross-examination of Vasterling in his case in chief.
The trial judge is charged with the duty of regulating the conduct of the trial and keeping from the jury irrelevant evidence in order that the jury may make a fair determination of the issues between the parties. Wexler v. Occhipinti, 378 So.2d 1073, 1078 (La.App. 4th Cir.1979), writ denied, 381 So.2d 1232 (La.1980). While the jury is certainly required to have all admissible evidence before them and to be instructed as to the applicable law involved in order to fairly adjudicate the rights, liabilities, and obligations of the parties in the suit, the determination of the admissibility of evidence is a function solely within the province of the trial judge. Hawthorne v. Southeastern Fidelity Insurance Co., 387 So.2d 26, 30-31 (La.App. 3rd Cir.1980). Further, whether evidence is relevant or not is within the discretion of the trial court, and its ruling will not be disturbed absent a clear abuse of discretion. Citizens Bank & Trust Co. v. Consolidated Terminal Warehouse, Inc., 460 So.2d 663, 670 (La.App. 1st Cir.1984).
Our review of the record in the instant case reveals that the trial judge carried out his duties and that he did not abuse his discretion in so doing.

DIRECTED VERDICT AND INVOLUNTARY DISMISSAL
Plaintiff contends that the trial court erred in granting Reliance's motion for directed verdict and the State's motion for involuntary dismissal.
Motion for Directed Verdict
LSA-C.C.P. art. 1810 provides that:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A trial judge has much discretion in determining whether or not to grant a motion for a directed verdict. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Lucas v. St. Frances Cabrini Hospital, 562 So.2d 999, 1006 (La. App. 3rd Cir.), writs denied, 567 So.2d 101, 103 (La.1990); Purvis v. American Motors Corporation, 538 So.2d 1015, 1019 (La. App. 1st Cir.1988), writ denied, 541 So.2d 900 (La.1989); Pritchard v. Safeco Insurance Company, 529 So.2d 449, 452-53 (La. App. 1st Cir.), writ denied, 532 So.2d 159 (La.1988).
The Louisiana Uninsured Motorist Statute LSA-R.S. 22:1406, in effect at the time of the accident, required that insurance policies provide uninsured motorist coverage for a person qualified as an "insured" under the policy. However, a person who does not qualify as an "insured" under the policy of insurance is not entitled to uninsured motorist coverage. Seaton v. Kelly, 339 So.2d 731, 734 (La.1976); Pierron *1163 v. Lirette, 468 So.2d 1305, 1307 (La. App. 1st Cir.1985).
In the instant case, the Reliance policy was issued to SID, the "named insured" under the policy. Daniel was an employee of SID and was provided an automobile for personal and business use which was insured by the Reliance policy with both liability and uninsured motorist coverage.
Plaintiff contends that the trial court erred in granting Reliance's motion for directed verdict. Plaintiff reasons that, under the clear and unambiguous language of the Reliance policy, Daniel, as an employee of SID, stands in the shoes of SID and is covered under the uninsured motorist provisions.
The uninsured motorist provisions of the Reliance policy defines an insured as follows:
1. You or any family member.
2. Anyone else occupying a covered auto or a temporary substitute for a covered auto. The covered auto must be out of service because of its breakdown, repair, servicing, loss or destruction.
3. Anyone for damages he is entitled to recover because of bodily injury sustained by another insured.
"You" is defined in the policy as "the person or organization shown as the named insured in ITEM ONE of the declarations."
Daniel was not a named insured under the policy. The named insured is SID. See Bryant v. Protective Casualty Insurance Company, 554 So.2d 177, 178-79 (La.App. 2nd Cir.1989), writ denied, 558 So.2d 1129 (La.1990); Rodriguez v. Continental Casualty Company, 551 So.2d 45, 47 (La.App. 1st Cir.1989); Pierron v. Lirette, 468 So.2d at 1308; Morris v. Mitchell, 451 So.2d 192, 193 (La.App. 1st Cir.1984). But see Employers Insurance Company of Wausau v. Dryden, 422 So.2d 1243, 1245 (La.App. 1st Cir.1982), wherein a policy issued to the "Terrebonne Parish Sheriff's Office" was determined to include the sheriff and all of the deputies of the named insured. (Emphasis added). Daniel is not a "family member" under the policy. The policy defines "family member" as a "person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child." Since the named is a corporation, Daniel can not be related by blood, adoption, or marriage to the named insured. See Bryant v. Protective Casualty Insurance Company, 554 So.2d at 178; Rodriguez v. Continental Casualty Company, 551 So.2d at 47. Finally, Daniel was not occupying a covered automobile. See Bryant v. Protective Casualty Insurance Company, 554 So.2d at 179; Rodriguez v. Continental Casualty Company, 551 So.2d at 47; Pierron v. Lirette, 468 So.2d at 1308; Morris v. Mitchell, 451 So.2d at 194. But see Employers Insurance Company of Wausau v. Dryden, 422 So.2d at 1245, wherein the deputy was determined to have been occupying an insured vehicle.
Because Daniel is not a named insured, is not related to the named insured, and was not occupying a covered automobile, he did not fit within the definition of an "insured" and was not covered by the uninsured motorist provisions of the Reliance policy.
We find no merit in plaintiff's contention that since the policy in question is a business automobile policy issued to a corporation, the definition of an insured as "you or any family member" renders the policy ambiguous. Bryant, Rodriguez, and Pierron involved policies issued to a municipality or corporations and contained policy language similar, if not identical, to the language in the instant case. These provisions were found to have a clear meaning and were not considered ambiguous in those cases. Nor do we find it to be ambiguous herein.
A motion for directed verdict may be granted under LSA-C.C.P. art. 1810 when the facts and inferences, considered in the light most favorable to the opposing party, point so strongly in favor of granting a directed verdict that reasonable persons could not reach a contrary conclusion. Pritchard v. Safeco Insurance Company, 529 So.2d at 452-53. This standard was met herein. Under the clear and unambiguous *1164 terms of the Reliance policy, Daniel was not an insured and reasonable persons could not have concluded otherwise. The trial judge did not err in granting Reliance's motion for directed verdict.
Motion for Involuntary Dismissal
LSA-C.C.P. art. 1672 B provides as follows:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
Unlike a motion for directed verdict in a jury trial, LSA-C.C.P. art. 1672 B requires a judge to evaluate all the evidence and render a decision based upon a preponderance of the evidence without any special inferences in favor of the opponent to the motion. Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366, 369 (La.App. 2nd Cir. 1988). Proof by a preponderance of the evidence simply means that taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not. Fuller v. Wal-Mart Stores, Inc., 519 So.2d at 369.
In the instant case, plaintiff contends that the State is liable because it "failed to improve and maintain U.S. 11, and as a result U.S. 11 was unreasonably dangerous to the traveling public." He further maintains that this alleged failure was a contributing cause of the accident. In support of this position, plaintiff relies on the testimony of Dr. Olin Dart, an expert in highway design. Dr. Dart opined that, although Highway 11 met all Louisiana Department of Transportation and Development (DOTD) minimum standards for a two-lane highway, considering the volume of traffic it carried, it should have been upgraded according to current standards to at least a four-lane highway. He indicated that the safety of Highway 11 could have also been enhanced by better lighting, a lower speed limit, and the stricter enforcement of a prohibition against cars parking on the shoulders of the highway in the area of Quarter Note Lounge.
Generally, DOTD has a duty to construct and maintain highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence. Robinson v. Estate of Haynes, 509 So.2d 128, 131 (La.App. 1st Cir.1987). However, the law is well-settled that DOTD is not responsible for every accident which may occur on the state highways, nor is it a guarantor of the safety of travelers thereof. Robinson v. Estate of Haynes, 509 So.2d at 131.
In an attempt to substantiate his contention that Highway 11 was unreasonably dangerous, plaintiff introduced accident statistics to show a high accident rate. However, on cross-examination Dr. Dart admitted that these statistics applied to a section of Highway 11 four miles in length. He admitted that he could not say that any of the accidents included in these statistics occurred in the proximity of Daniel's accident.
Additionally, Dr. Dart stressed that according to the volume of traffic, Highway 11 should have been enlarged to at least a four-lane highway under current standards. The instant accident, however, occurred at night when the flow of traffic was very light and the purported volume deficiency had no causative effect on this accident. Further, the mere fact that a highway may not meet current standards does not in itself establish the existence of a hazardous defect. Jones v. State, Department of Transportation and Development, 536 So.2d 446, 448 (La.App. 1st Cir. 1988), writ denied, 537 So.2d 212 (La.1989); Robinson v. Estate of Haynes, 509 So.2d at 134. Moreover, even though Dr. Dart felt the highway was inadequate for the volume of traffic it handled and that certain improvements would make it safer, he did not state an opinion that Highway 11 was *1165 unreasonably dangerous. Nor does the evidence support such a conclusion.
After carefully reviewing the entire record, we cannot say the trial judge erred in his conclusion that plaintiff failed to establish, by a preponderance of the evidence, that the State was guilty of any negligence causing injury to Daniel or that at the point of this accident Highway 11 was unreasonably dangerous. It clearly was not shown by a preponderance of the evidence that any of the factors of which plaintiff complained created an unreasonably dangerous condition or that these factors were a cause-in-fact of plaintiff's injuries.
Accordingly, we find that the trial judge did not err in granting the State's motion for involuntary dismissal.

COMPARATIVE FAULT
In his answer to Aetna's appeal, plaintiff contends that the jury erred in assessing him with 49% of the fault.
Under the Civil Code, every act of a person that causes damage to another obliges the one by whose fault it happened to repair it. LSA-C.C. art. 2315. Generally negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. Dobson v. Louisiana Power and Light Company, 567 So.2d 569, 574 (La.1990); Restatement (Second) of Torts, § 282 (1965); Harper, James & Gray, The Law of Torts, § 16.1 at 381-382 (1986); Prosser & Keeton on Torts, § 31 (5th ed. 1984).
When contributory negligence is applicable to a claim for damages and a person suffers injury, death or loss partly as a result of his own negligence and partly as a result of the fault of another person, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss. LSA-C.C. art. 2323; Dobson v. Louisiana Power and Light Company, 567 So.2d at 574; Williams v. Stevenson, 558 So.2d 1204, 1207 (La.App. 1st Cir.), writ denied, 564 So.2d 324 (La. 1990).
Previously, in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the Louisiana Supreme Court set forth guidelines for applying the mandate of LSA-C.C. art. 2323 as follows:
We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. (Footnotes omitted).
469 So.2d at 973-974.
In Dobson v. Louisiana Power and Light Company, 567 So.2d at 574-75, the Louisiana Supreme Court held that the test for determining whether a risk is unreasonable is supplied by the "Hand formula," which is also appropriate to measure and compare the negligence or fault of one person with that of another and provides a *1166 methodology for accommodating and weighing all of these factors, including the factors previously espoused in Watson v. State Farm Fire and Casualty Insurance Co.
The Hand formula helps to "center attention upon which one of the factors may be determinative in any given situation" and provides as follows:
The amount of caution "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice, or the cost of the precaution he must take, to avoid the risk." If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence. (citations omitted).
567 So.2d at 574-575.
When reviewing a jury's apportionment of fault, this court must apply the manifest error rule. See Lirette v. State Farm Insurance Company, 563 So.2d 850, 852 (La.1990); Williams v. Stevenson, 558 So.2d at 1207.
In the instant case, Daniel, after spending several hours in a local lounge consuming numerous alcoholic beverages, left the lounge, crossed a busy highway, and was struck by a passing motorist. Thames was proceeding along the highway at a reasonable rate of speed, but never actually saw Daniel step in front of his vehicle. After carefully weighing their conduct in light of the Hand formula and the Watson factors, we find that the jury, in apportioning the parties' relative degree of fault, was not clearly wrong in finding Daniel 49% at fault and Thames 51% at fault. We have reviewed the evidence and conclude that this court has no basis for substituting a different view of the evidence and reallocating the percentages of fault and that the jury made reasonable inferences of fact, which were not clearly wrong.

COURSE AND SCOPE OF EMPLOYMENT
Aetna contends Daniel's injuries are not covered under the excess indemnity policy because Daniel was not an insured under the policy at the time of his injury.[5]
Section 3.1(d) of the Aetna policy provides that an insured under the policy includes any "employee ... of the named insured [SID] while acting within the scope of his duties as such ..." (bolding added). There is no question that Daniel was an employee of SID, however, the dispositive issue is whether Daniel was "acting within the scope of his duties as such" at the time of his injury.
It is undisputed that the subject of the meeting Daniel attended on the afternoon of the accident concerned renovations being performed on the Metairie premises preparatory to its opening as a retail furniture store. It is also undisputed that the lease for these premises and the contract for renovations were executed by Barnes on behalf of Monasco International, Inc. (Monasco). The uncontradicted testimony of Jack reveals that Daniel discussed the renovation project the entire time they were together in the Quarter Note Lounge. Nevertheless, Aetna contends that, on the day of the accident, the business Daniel and Jack undertook was on behalf of Monasco and not SID. Aetna reasons that, as a result, Daniel was not within the scope of his duties for SID.
Usually, course and scope of employment questions arise in worker's compensation cases. However, regardless of the context in which such questions arise, the legal *1167 principles applied in making such determinations are the same. Castille v. All American Insurance Company, 550 So.2d 334, 336 (La.App. 3rd Cir.1989), writ denied, 556 So.2d 1261 (La.1990); Hebert v. Witherington, 520 So.2d 1075, 1077 (La. App. 3rd Cir.1987), writ denied, 522 So.2d 566 (La.1988).
In Johnson v. Dufrene, 433 So.2d 1109 (La.App. 4th Cir.1983), the court correctly and succinctly set forth the guidelines to determine whether an employee is within the course and scope of his employment as follows:
The specific inquiry is whether the employee's tortious conduct "was so closely connected in time, place and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest." Daniels v. Conn, 382 So.2d 945 (La.1980); LeBrane v. Lewis, 292 So.2d 216 (La.1974). In those instances where the injury is caused by an employee's negligence while driving a vehicle owned by his employer, our jurisprudence has repeatedly stated that every case must be decided on its own facts. The important considerations which bear on the result are whether the vehicle was being used in such a manner as to benefit the employer. Taylor v. Lumpkin, 391 So.2d 74 (La.App. 4th Cir. 1980); whether the employee was subject to the employer's control at the time of the accident, Keen v. Pel State Oil Co., Inc., 332 So.2d 286 (La.App. 2d Cir.1976); whether the employee's use of the vehicle was authorized by the employer, Harding v. Christiana, 103 So.2d 301 (La.App. Orleans 1958); Futch v. W. Horace Williams Co., 26 So.2d 776 (La. App. 1st Cir.1946); reh. den., 27 So.2d 184 (La.App.1946); and whether the employee's motive arose from personal objectives or, instead, from his employer's concerns, Keen, supra, Johns v. Hunt Lumber Company, Inc., 250 So.2d 543 (La.App. 2d Cir.1971).
433 So.2d at 1112. See also Mattingly v. State, Department of Health and Human Resources, 509 So.2d 82, 84 (La.App. 1st Cir.), writ denied, 512 So.2d 461 (La.1987).
In McGee v. State Farm Mutual Automobile Insurance Company, 428 So.2d 1287 (La.App. 3rd Cir.1983), our brethren of the Third Circuit discussed the difference between the phrases "scope of" and "in the course of" as follows:
We also place emphasis on the use of the phrase "scope of their duties" in the policy rather than the worker's compensation phrases, "arising out of" (scope) and "in the course of". These two worker's compensation terms have been held to not be synonymous. The former deals with whether the employee was engaged in his employer's business or his own and the latter concerns the time and place relationship between the risk and the employment. Renfroe v. City of New Orleans, 394 So.2d 787 (La.App. 4th Cir. 1981), writ denied, 399 So.2d 621 (La. 1981). Similarly, the Supreme Court in LeBrane v. Lewis, 292 So.2d 216 (La. 1974), pointed out the difference between "scope" and "course" of employment in this fashion:
"However, technically, `course of' may refer more to the time and place of employment, while `scope of' refers more to while being engaged in the functions for which employed."
428 So.2d at 1289.
In the instant case, an examination of the record reveals that SID originally began business in 1973 as a partnership between White and Barnes. White provided the capital for the venture, and Barnes operated the business. Their ownership interests were 40% and 60%, respectively. The business was subsequently incorporated in 1975, with the parties retaining their respective interests in the corporation's stock. Barnes served as the corporation's president, and White served as its vice-president and secretary, although White had no function in the daily operation of the corporation.
On July 9, 1982, Barnes incorporated Monasco with herself as the sole shareholder. The name "Monasco" was an acronym for *1168 "Mona's company." Although this corporation was initially formed with no specific purpose in mind, Barnes subsequently intended to operate the corporation for the sale of furniture. Barnes testified Monasco was merely a paper corporation with no assets, employees, bank accounts, or insurance, but Monasco had a separate tax identification number and apparently filed separate tax returns.
At some point, Barnes became interested in opening a second furniture store. She testified that a corporate resolution was necessary for SID to open a second location, but that White was initially disinterested in the proposition. Although a corporate resolution was not signed, formally authorizing the venture, on July 19, 1982, Barnes on behalf of Monasco, executed a lease for certain premises in Metairie for the operation of a "retail furniture store." The lease was to commence on March 1, 1983.[6] Barnes was listed as guarantor on this lease and her personal address was listed as the tenant's address.
Thereafter, in August of 1982, a problem arose regarding the renewal of the lease of the SID store on St. Charles Avenue. Barnes testified that the lessor did not wish to conduct any business with White, and, as a result, the St. Charles Avenue store was eventually leased to Monasco, which then sub-leased it to SID.
On May 11, 1983, Monasco, through Barnes, entered into a contract with ASH to perform renovations to the interior of the Metairie furniture store. Although no payments were made on this work prior to the accident, Barnes testified that, after the accident, payments were made with SID proceeds. The store in Metairie was eventually opened on November 2, 1983, as the "Denmark Shop" as a branch store of SID.
While a question may exist as to whether Barnes, as president and majority shareholder of SID, was expressly authorized by SID's board of directors to complete the Metairie branch venture, this issue is not pertinent as to whether Daniel was acting within the scope of his employment with SID at the time of the accident.
The evidence, mostly established through the unrebutted testimony of Barnes, reveals that at the time of the accident, Daniel was an employee and manager of SID. Barnes testified that SID paid Daniel's salary and provided him with transportation and that at no time was Daniel employed by Monasco. In describing Daniel's duties, Barnes testified that Daniel handled deliveries, advertising, sales, and purchasing and oversaw the warehouse and displays. On the day of the accident, Daniel informed Barnes of his planned meeting with Wolfe. Although Barnes acknowledged that she would have preferred that Daniel remain at the store, she testified that, after Daniel assured her he would take care of everything before he left, she assented to his meeting in Slidell.
The record is devoid of any evidence that Daniel was in Slidell or was meeting with Wolfe or Jack for any personal reasons. Rather, the record amply supports the jury's finding that Daniel was in Slidell in furtherance of his employer's interest and at the request of his employer. Accordingly, we conclude that, the jury correctly determined that at the time of his accident Daniel was acting within the scope of his duties as an employee of SID.

JUDGMENT NOV
In ruling on a motion for JNOV under LSA-C.C.P. art. 1811, the trial court is required to employ the following legal standard: A JNOV should only be granted if the trial court, after considering all of the evidence in the light most favorable to the party opposed to the motion, finds it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Adams v. Security Insurance Company of Hartford, 543 So.2d 480, 486 (La.1989); Bergeron v. Main Iron Works, Inc., 563 So.2d 954, 956 (La.App. 1st Cir.), writs denied, 569 So.2d 960, 965 *1169 (La.1990); Cosie v. Aetna Casualty & Surety Insurance Co., 527 So.2d 1105, 1107 (La.App. 1st Cir.1988). However, if there is substantial evidence of such quality and weight that reasonable persons might have reached different conclusions, the motion must be denied. Bergeron v. Main Iron Works, Inc., 563 So.2d at 956. In applying this standard, the court cannot weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury. Pitts v. Bailes, 551 So.2d 1363, 1373 (La.App. 3rd Cir.1989), writs denied, 553 So.2d 860 (La. 1989) and 556 So.2d 1262 (La.1990).
In reviewing the grant of a motion for JNOV on the issues of liability and damages, the Court of Appeal must examine the record to determine whether the trial judge's conclusions on liability and quantum were manifestly erroneous. Pitts v. Bailes, 551 So.2d at 1373; Cosie v. Aetna Casualty & Surety Insurance Co., 527 So.2d at 1107.
A claimant for penalties and attorney's fees under the statute has the burden of proving that the insurer failed to pay the claim within 60 days after receiving "satisfactory proof of loss" of the claim and that the insurer was arbitrary or capricious in failing to pay. LSA-R.S. 22:658.[7] A "satisfactory proof of loss" within the meaning of LSA-R.S. 22:658 is that which is sufficient to fully apprise the insurer of the insured's claim. McDill v. Utica Mutual Insurance Company, 475 So.2d 1085, 1089 (La.1985); Hart v. Allstate Insurance Company, 437 So.2d 823, 828 (La.1983).
To establish "satisfactory proof of loss" of an uninsured/underinsured motorist's claim, the insured must establish that the insurer received sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or underinsured; (2) he was at fault; (3) such fault gave rise to damages; and (4) the extent of those damages. McDill v. Utica Mutual Insurance Company, 475 So.2d at 1089; Hart v. Allstate Insurance Company, 437 So.2d at 828.
If it has been adequately established that an insurer is liable for some general damages, but not precisely how much, the insurer must unconditionally tender the reasonable amount of damages due or it will be liable for penalties and attorney's fees under LSA-R.S. 22:658. McDill v. Utica Mutual Insurance Company, 475 So.2d at 1091; Hardy v. Cumis Insurance Company, 558 So.2d 625, 628 (La.App. 1st Cir.), writ denied, 559 So.2d 1385 (La.1990). In such instances, the reasonable amount due is that amount over which "reasonable minds could not differ." McDill v. Utica Mutual Insurance Company, 475 So.2d at 1092: Hardy v. Cumis Insurance Company, 558 So.2d at 628.
Therefore, in order to prevail on the claim for penalties and attorney's fees in the instant case, Daniel was required to establish that Aetna received "satisfactory proof of loss," that Aetna failed to pay his claim within 60 days of receipt of such proof of loss, and that Aetna was arbitrary and capricious in failing to pay his claim.
Satisfactory proof of loss
The testimony of David Vasterling and Aetna's internal documents establish that by September of 1984, Aetna was aware that Thames was underinsured in that his policy provided only $50,000.00 in coverage. Aetna also determined that Thames was at least partially at fault in causing the accident in that Aetna estimated their liability at approximately 25%. Aetna based this estimation on the great burden placed upon a driver of a vehicle to observe pedestrians. Further, as early as August of 1984, Aetna was aware of the irreversible brain damage Daniel suffered. Later estimates show that Aetna acknowledged that the claim was valued at $1.3 million. Additionally, Aetna's internal documents also reveal that it realized Daniel was insured under its policy.
*1170 Considering the foregoing, we find that by September of 1984, Aetna was fully apprised of Daniel's claim.

Failure to pay within 60 days
The evidence is uncontradicted that Aetna failed to pay Daniel any sum for the damages he sustained. Vasterling acknowledged that despite his evaluation of Aetna's exposure on the claim at approximately $325,000.00, Aetna had, as of the date of trial, failed to tender any amount to its insured. Clearly, Aetna failed to pay the claim within 60 days.

Arbitrary and capricious
In the present case, there is little question that Aetna should have tendered some amount to Daniel. However, it consistently and steadfastly refused to tender any sum whatsoever. The facts do not support any probable cause for non-payment.
Based upon the evidence, we find that the trial court erred in granting Aetna's motion for JNOV.[8] Considering all of the evidence in the light most favorable to Daniel, the evidence does not point so strongly and overwhelmingly in favor of Aetna that reasonable persons could not arrive at a contrary verdict.

LIABILITY FOR INTEREST WHICH EXCEEDS POLICY LIMITS
Aetna contends that the trial court erred in casting it for interest on the $735,000.00, the amount by which the judgment exceeded Aetna's policy limits. Aetna reasons that its policy does not contain a supplementary payments provision and that it should not be liable for interest on the amount by which the judgment exceeded the policy limits.
Although Aetna and Daniel refer to various provisions of the policy in support of their respective positions, we note that the Aetna policy provides the following supplementary payments provision:
The company will pay, in addition to the applicable limit of liability;
(a) all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon; (underscore added).
The jurisprudence has interpreted identical supplementary payment clauses on numerous occasions. The courts have consistently held that the insurer intended to provide its insured with supplementary protection for all interest and costs on the entire judgment which accrues after entry of judgment. Remedies v. Lopez, 560 So.2d 118, 120 (La.App. 3rd Cir.), writ denied, 563 So.2d 1155 (La.1990); Moon v. City of Baton Rouge, 522 So.2d 117, 127 (La.App. 1st Cir.1987), writ denied, 523 So.2d 1319, 1320, 1327 (La.1988); Fletcher v. Leader National Insurance Company, 513 So.2d 1226, 1228 (La.App. 4th Cir.1987).
Accordingly, we find that the trial court did not err in finding Aetna liable for legal interest on the entire amount of the judgment (including the portion in excess of their policy limits) from date of judgment until paid.

CONCLUSION
For the above reasons, that portion of the trial court judgment granting Aetna's motion for JNOV is reversed. The case is remanded to the trial court for the limited purpose of conducting an evidentiary hearing on the amount of attorney's fees. In all other respects, the judgment of the trial court is affirmed. Aetna is cast for all costs on appeal.
*1171 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
LOTTINGER, J., concurs and dissents, and assigns reasons.
WATKINS, J., concurs in part and dissents in part for reasons assigned.
CRAIN, and EDWARDS, JJ., concur in part and dissent in part for reasons assigned by LOTTINGER, J.
SAVOIE, J., concurs in result.
FOIL, J., concurs in part and dissents in part. I would not award penalties and attorney fees.
LeBLANC, J., concurs in part and dissents in part and will assign reasons.
LANIER, J., concurs in part and dissents in part for the reasons assigned by LeBLANC, J.
LOTTINGER, Judge, concurring in part and dissenting in part.
I concur in the result reached by the majority, however, I dissent from that portion of the majority opinion denying uninsured motorist coverage under the Reliance Insurance Company policy.
Simply stated, when an uninsured motorist endorsement to a business auto liability policy defines an insured as "you or any family member," the endorsement is ambiguous. Everyone agrees that a corporation cannot have a "family member," thus the definition of an insured as such is ambiguous. Any doubt or ambiguity in an insurance policy should be interpreted against the insurer and in favor of coverage. Credeur v. Luke, 368 So.2d 1030 (La.1979). It would be a simple and inexpensive matter to use an endorsement which did not create such an ambiguity if the intention was to cover someone only while occupying a covered auto.
Under the ambiguity of this endorsement, I would extend uninsured motorist coverage to the employee to whom the covered auto was assigned.
WATKINS, Judge, concurring in part and dissenting in part.
I concur in that part of the majority opinion which affirms the trial court's judgment against Aetna. I dissent from that part of the majority opinion denying uninsured motorist coverage for the reasons assigned by Judge Lottinger. I also dissent from that part of the majority opinion which reverses the JNOV granted by the trial court in favor of Aetna on statutory penalties and attorney's fees, because I do not find Aetna's failure to settle was arbitrary and capricious.
LeBLANC, Judge, concurring and dissenting.
I concur with the majority in its ruling that Daniel White was not covered by the Reliance policy.
I respectfully dissent from the majority's finding of coverage under the Aetna policy for the reasons set forth below.

Aetna's Appeal
Aetna contends Daniel White's injuries are not covered under the excess indemnity policy it issued to S.I.D. because White was not an insured under the policy at the time of his injury. Plaintiffs dispute this assertion, arguing White was an "insured" under Section 3.1(d) of the policy which provides, in part, that an insured under the policy includes any "employee ... of the named insured [S.I.D.] while acting within the scope of his duties as such...." Since there is no question that White was an employee of S.I.D., the dispositive issue is thus whether he was "acting within the scope of his duties as such" at the time of his injury.
It is not disputed that the subject of the meeting Daniel White attended on the afternoon of the accident concerned renovations being performed on the Metairie premises preparatory to opening it as a retail furniture store. It is also not disputed that the lease for these premises and the contract for renovations were executed by Monasco, through Mona Barnes. The jury also apparently accepted Warren Jack's uncontradicted testimony that he *1172 and White discussed the renovation project the entire time they were together in the Quarter Note Lounge. I find no manifest error in this conclusion.
Nevertheless, Aetna's position is that even if White and Jack did discuss business the entire time, it was business which concerned the renovation of the Metairie store only, which was not undertaken on behalf of S.I.D., the named insured, but rather for the benefit of Monasco, an entirely separate corporation and therefore was not within the scope of his duties for S.I.D. Plaintiffs' apparent response to this argument is that Monasco was a mere alter ego or instrumentality of S.I.D. and was not a true separate entity. The first essential inquiry thus is whether Monasco was actually an alter ego of S.I.D.
A corporation is a legally separate entity. G.I.'s Club of Slidell v. Am. Leg. Post 374, 504 So.2d 967 (La.App. 1st Cir.1987); Adams v. Associates Corp. of North America, 390 So.2d 539 (La.App. 3d Cir. 1980), writ refused, 396 So.2d 884 (La. 1981). However, under certain circumstances, if the business of the corporation is conducted in such a manner that its identity becomes indistinguishable from that of its shareholders (or another corporation), then a corporation may be determined to be the shareholders' (or the other corporation's) alter ego, justifying a disregard of its separate identity. Harris v. Best of America Inc., 466 So.2d 1309 (La. App. 1st Cir.) writ denied, 470 So.2d 121 (La.1985); Adams, supra. However, this may occur only in exceptional circumstances. Id. Further, the party seeking to disregard the separate entity principal bears a heavy burden of establishing by clear and convincing evidence that a corporation is not a separate entity, but merely an alter ego of its shareholders or another corporation. Harris, supra. Significant factors in this determination include: commingling of corporation or shareholder funds; failure to follow statutory formalities for incorporation and for the transaction of corporate affairs; undercapitalization; failure to provide separate bank accounts and bookkeeping records; and, failure to hold regular shareholder or director meetings. G.I.'s Club of Slidell, supra.
An examination of the record in this case indicates that S.I.D. originally began business in 1973 as a partnership between Mona Barnes and James White (Daniel's uncle). White provided the capital for the venture and Ms. Barnes ran the business. Their respective ownership interests were 40/60. The business was incorporated in 1975, with the parties retaining the same respective interests in the corporation's stock. Ms. Barnes was S.I.D.'s president and White its vice-president and secretary, although he continued to have no function in the daily operation of the corporation.
On July 9, 1982, Ms. Barnes incorporated Monasco International, Inc. (Monasco) with herself as the sole shareholder. The name "Monasco" was an acronym for "Mona's company". She stated that she formed the corporation "thinking of something entirely different that didn't have anything to do with the furniture business." However, later in her testimony she contradicted herself, saying Monasco was incorporated for the purpose of the sale of furniture and for other purposes. Ms. Barnes stated Monasco was merely a paper corporation with no assets, employees, bank account or insurance. Yet Monasco did have a separate tax identification number and apparently filed separate tax returns.
At some point, Ms. Barnes became interested in opening a second furniture store. She testified that a corporate resolution was necessary for S.I.D. to open a second location. However, James White was not interested in such a venture and a corporate resolution was never passed apparently for this reason. On July 19, 1982, shortly after Monasco was incorporated, a lease for certain premises in Metairie for the operation of a "retail furniture store" was executed by Ms. Barnes on behalf of Monasco, to commence on March 1, 1983.[1] Mona Barnes was listed as guarantor on *1173 this lease and her personal address was listed as the tenant's address.
Thereafter, sometime in August of 1982, a problem evidently arose regarding the renewal of the lease of the S.I.D. store on St. Charles Avenue. Ms. Barnes testified that because the lessor did not wish to conduct any business with James White, the St. Charles Avenue store was eventually leased to Monasco, which then sub-leased it to S.I.D.
On May 11, 1983, Monasco, through Ms. Barnes, entered into a contract with A.S.H. to perform renovations to the interior of the Metairie furniture store. This work was eventually paid for after the accident in question, with the proceeds of a S.B.A. loan obtained by Ms. Barnes on behalf of Monasco. The store in Metairie was eventually opened on November 2, 1983 as the "Denmark Shop". No S.I.D. funds were used in opening the store.
Based on the totality of the evidence in the record regarding the relationship of S.I.D. and Monasco, as detailed above, I conclude the evidence is clearly insufficient to establish Monasco was an alter ego of S.I.D. While the record contains some indications Monasco may have been an alter ego of Mona Barnes, individually, the same can not be said of S.I.D. Plaintiffs do not dispute that Monasco was properly incorporated. Further, no evidence was presented of any commingling of funds between S.I.D. and Monasco. Nor was there any evidence that corporate formalities were not observed in the transaction of Monasco's business, that it failed to keep separate bookkeeping records or failed to hold regular shareholder or director meetings. There was evidence that Monasco obtained a S.B.A. loan to pay for the renovations to the Metairie store, that it had a separate tax identification number and that it filed separate tax returns. Considering all these factors, I do not believe the exceptional circumstances necessary to justify disregarding the separateness of a corporate entity can be said to be present herein. The evidence in the record is insufficient to meet the burden of proof necessary to establish that Monasco was merely an alter ego or instrumentality of S.I.D. Accordingly, I conclude that, at the time of his accident Daniel White was engaged in activities on behalf of Monasco rather than his employer, S.I.D. Although the jury did not make a specific finding on this exact issue, I observe that any conclusion to the contrary would have been clearly erroneous.[2]
However, the conclusion that White was acting for the benefit of a corporation other than his employer does not end the inquiry as to whether he was acting within the scope of his duties as S.I.D.'s employee at the time of his injury.[3] The Supreme Court recently pronounced in Ermert v. Hartford Insurance Company, 559 So.2d 467, 477 (La.1990) that the fact that the predominant motive of a servant's conduct is to benefit himself or a third party does not necessarily preclude the conduct from being within the scope of his employment, if the purpose of serving the master's (employer's) business actuates the servant to any appreciable extent and the conduct is otherwise within the service.
There are no hard and fast rules for determining whether a particular employee's *1174 conduct is within the course and scope of his employment. Fogg v. Lott, 444 So.2d 177 (La.App. 1st Cir.1983). This determination is dependent upon the particular facts and circumstances of each case. Id, However, in considering this issue the following observations made by the Supreme Court in Reed v. House of Decor, Inc., 468 So.2d 1159 (La.1985), should be borne in mind.
Determination of the course and scope of employment is largely based on policy. The risks which are generated by an employee's activities while serving his employer's interests are properly allocated to the employer as a cost of engaging in the enterprise. However, when the party (the alleged employer) upon whom vicarious liability is sought to be imposed had only a marginal relationship with the act which generated the risk and did not benefit by it, the purpose of the policy falls, and the responsibility for preventing the risk is solely upon the tortfeasor who created the risk while performing the act. 468 So.2d at 1162.
In the present case, I believe White's activities bore only a marginal relationship to his employment for S.I.D. Further, there was no evidence that S.I.D. benefited in any manner from White's activities relative to opening the Metairie store, which was owned by a separate corporation. In fact, since both corporations (S.I.D. and Monasco) were in the business of selling contemporary Danish furniture, they might even have been considered competitors. White's conduct would appear to have been motivated either by a desire to serve his mother's interest, since she was Monasco's sole shareholder, or his own, since it was contemplated that he would become the manager of the Metairie store. Although plaintiffs allege in their brief that White's employer (presumably his mother) assigned him the task of supervising the renovations of the Metairie store, the record does not adequately substantiate this contention. Under these circumstances, I do not believe White's conduct can be attributed to his employment with S.I.D. so as to render it within the scope of his employment. Thus, I conclude White was not acting "within the scope of his duties" as S.I.D.'s employee when he was injured as required for coverage under the Aetna policy. The jury clearly erred in concluding otherwise, the evidence presented being insufficient to sustain such a conclusion.
Because I find no coverage under the Aetna policy, I express no opinion on the percentage of fault attributed to parties by the jury. Neither do I express any opinion on the issue of penalities and attorney fees.
LANIER, J., concurs in reasons.
NOTES
[*] Judge Steve A. Alford, Jr., although participating in hearing the oral arguments of this case, did not participate in the decision due to his subsequent death.
[**] Judge Lewis S. Doherty, III, retired, is serving as judge pro tem by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.
[1] Daniel was also rendered mentally incompetent by his injuries, and he was subsequently interdicted. Barnes was appointed as provisional curator.
[2] Barnes also named numerous other parties as defendants, none of who are relevant to this appeal.
[3] The parties jointly stipulated that Daniel suffered damages of $3.5 million.
[4] Aetna reasons that, in his petition, plaintiff alleged one possible scenario for the accident and that, at trial, plaintiff's evidence supported a different factual scenario, i.e. whether plaintiff was struck from the rear, as alleged in his pleadings, or from the right, as testified to by the accident reconstruction expert.
[5] We note that the Aetna policy did not specifically provide for uninsured motorist coverage. However, since there was no valid waiver of such coverage, the policy must be construed under the dictates of Southern American Insurance Company v. Dobson, 441 So.2d 1185 (La. 1983) as providing uninsured motorist protection. Additionally, Aetna did not appeal the trial court determination that its policy provided such coverage. Therefore, this issue is not before us on appeal.
[6] The tenant was listed at one space on the lease as "Monasco International, Inc. d/b/a Shop in Denmark," although elsewhere on the lease it was referred to as Monasco International, Inc.
[7] By Acts 1989, No. 638, § 1, the Legislature amended LSA-R.S. 22:658 reducing the time limit within which the insurer must pay the claim from 60 to 30 days.
[8] Prior to the trial court's granting of the JNOV, the judgment awarded plaintiff attorney's fees, but specifically provided that the amount of such fees would be determined at a later date. The parties and the trial court obviously contemplated an evidentiary hearing to determine the amount of such fees. In reversing the JNOV, the original judgment on the issue of amount of attorney's fees is, in effect, reinstated. Accordingly, we will not determine the amount of fees to which plaintiff is entitled because an evidentiary hearing will be held by the trial court subsequent to this court's decision to fix attorney's fees.
[1] The tenant was listed at one space on the lease as "Monasco International, Inc. d/b/a Shop in Denmark", although elsewhere on the lease it was referred to as Monasco International, Inc.
[2] We note incidentally that the jury was not instructed on the appropriate burden of proof to be applied in considering whether one corporation is the alter ego of another, which is a heavier burden than the normal preponderance of the evidence standard. See, Harris v. Best of America, Inc., 466 So.2d 1309 (La.App. 1st Cir.), writ denied, 470 So.2d 121 (La.1985). This omission was not assigned as error, however, and we do not now address it as such.
[3] Plaintiffs argue that the standard applied in determining the scope of employment for worker's compensation purposes should be applied in this case, rather than the standard applied in tort cases. It is well-established that for reasons of public policy, a more liberal construction is given to this determination, in worker's compensation than in tort cases. Reed v. Gulf Ins. Co., 447 So.2d 1102, ftnt. 1 (La.App. 4th Cir. 1984) affirmed, 468 So.2d 1159 (1985); McGee v. State Farm Mut. Auto. Ins., 428 So.2d 1287 (La. App. 3d Cir.1983); Harris v. Hymel Store Co., 200 So.2d 84 (La.App. 1st Cir.) writ refused, 251 La. 47, 202 So.2d 657 (1967). However, since these policy considerations are not applicable herein, we see no justification for applying the more liberal construction to the terms of Aetna's policy. McGee, supra.